United States Bankruptcy Court
Southern District of Texas

**ENTERED**

May 27, 2026

Nathan Ochsner, Clerk

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 22-90273** |
| **MINING PROJECT WIND** | § | |
| **DOWN HOLDINGS INC.,** *et al.,* | § | **CHAPTER 11** |
| | § | |
| Debtors. | § | |
| | § | |
| **TRIBOLET ADVISORS LLC,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | **ADVERSARY NO. 23-3210** |
| | § | |
| **CORPUS CHRISTI ENERGY** | § | |
| **PARK, LLC,** *et al.,* | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION

Corpus Christi Energy Park, LLC, and Bootstrap Energy, LLC move for partial summary judgment on Tribolet Advisors LLC's[1] claims for violation of automatic stay, transfer avoidance, unjust enrichment, and piercing the corporate veil.

For the reasons stated below:

1. The constructive fraudulent transfer avoidance claim over the Design Build Contract payments fails as a matter of law.

2. The claim for unjust enrichment fails as a matter of law.

3. The alter ego/piercing the veil claim fails as a matter of law.

---

[1] Tribolet Advisors LLC is the plan administrator and trustee for the litigation trust under the confirmed plan.  Case No. 22-90273, ECF No. 889.

1 / 16

4. The preferential transfer claim for $35,000 in storage fee payments is moot.

5. The claim seeking contempt damages for violation of the automatic stay fails as a matter of law.

## BACKGROUND

Compute North owned and operated cryptocurrency mining data centers. ECF No. 138-1 at 28. Bootstrap Energy, LLC was formed to develop "large scale energy infrastructure projects" for data centers. ECF No. 138-1 at 7–8.

In February 2021, Bootstrap identified a 114-acre tract of land in Corpus Christi, Texas for its "Corpus Christi Energy Park." ECF No. 138-1 at 8. Bootstrap's plan was to develop a "shovel ready" site on the land, and market parcels of the site to prospective data center owners. ECF No. 138-1 at 8. Bootstrap pitched the idea to Compute North in October 2021.

Following negotiations, Compute North and Bootstrap, *doing business as* Corpus Christi Energy Park, LLC, entered into a term sheet purchase agreement. ECF No. 138-2 at 256. The Term Sheet provided that Bootstrap would develop and obtain easements on the 114-acre tract of land, and Compute North would prepay $500,000.00 for a 50 year ground lease on a 33.8 acre parcel ("1102 McKinzie"). The ground lease would convert into fee title upon partition and land survey approval. ECF No. 138-2 at 257.

Under the Term Sheet, Compute North paid $2,371,500.00 for earnest money, and $758,880.00 for a termination option fee "in consideration for reserving a 30-day exclusive option period of negotiation . . . ." ECF No. 138-2 at 257.

In March 2022, Compute North Corpus Christi, LLC and Corpus Christi Energy Park entered into the design build contract for an original purchase price of $24,250,000.00. ECF No. 143-1 at 6. The

purchase price was to be paid in installments.  ECF No. 143-1 at 50. Upon execution of the Design Build  Contract, about $10.37 million was paid to Bootstrap.  The $10.37 million was funded from the release of the escrowed earnest money, and an additional payment of $8 million.

The Design Build Contract required Corpus Christi Energy Park to tender a satisfactory interconnection agreement with AEP Texas for 300 MW of electricity capacity to Compute North within 60 days of the signing of the contract.  ECF No. 143-1 at 10.  Corpus Christi Energy Park did not tender a satisfactory AEP letter of agreement by the 60-day deadline.

On  June 3, 2022, Corpus Christi Energy Park issued a notice of default to Compute North for failure to timely pay for the first half of a change order executed in May 2022.  ECF No. 138 at 22.  A few days later, Compute North emailed Corpus Christi Energy Park regarding its right to terminate the Design Build Contract for failure to timely provide the AEP Agreement.  ECF No. 139-1 at 109.  However, Compute North expressed its interest in proceeding with the project.  ECF No. 139-1 at 109 ("Notwithstanding this notice, Compute North's strong preference is for the project contemplated by the DBIA to proceed."). Later in the month, Corpus Christi Energy Park sent Compute North another notice of nonpayment on the change order, exercising its right to stop work. ECF No. 138-1 at 236.  Despite cross notices of defaults, the parties proceeded with the project.  ECF No. 138 at 23.

On August 25, 2022, Corpus Christi Energy Park provided a new AEP Agreement to Compute North.  ECF No. 138 at 24.  The next day, Corpus Christi Energy Park communicated to Compute North intent to terminate the Design Build Contract for Compute North's failure to make its third milestone payment.  ECF No. 138-1 at 240.

On September 22, 2022, Compute North and its affiliates filed for chapter 11 bankruptcy protection.

In December 20, 2022, the Court entered an agreed order terminating the Design Build Contract.  Case No. 22-90273, ECF No. 709.

After the Design Build Contract was terminated, Corpus Christi Energy Park and Bootstrap completed the 1102 McKinzie facility, and sold it to a third-party buyer.  ECF No. 143-2 at 60.  Tribolet alleges that Corpus Christi Energy Park and Bootstrap used Compute North's payments under the Design Build Contract to complete the facility.  ECF No. 143 at 10.  Tribolet also alleges that they used the funds on another project ("1242 McKinzie Project") in the Energy Park.  ECF No. 143 at 11.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute of material fact means that evidence is such that a reasonable fact finder "could return a verdict for the nonmoving party." *Gorman v. Verizon Wireless Tex., L.L.C.*, 753 F.3d 165, 170 (5th Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  It is the movant's burden to establish that no genuine issue of material fact exists.  *Sossamon v. Lone Star State*, 560 F.3d 316, 326 (5th Cir. 2009) (citing *Condrey v. SunTrust Bank*, 429 F.3d 556, 562 (5th Cir. 2005)).  A party asserting that a fact cannot be or is not genuinely disputed must support that assertion by citing particular parts of materials in the record, showing that the materials cited do not establish the absence or presence of a genuine dispute, or showing that an adverse party cannot produce admissible evidence to support that fact.  FED. R. CIV. P. 56(c)(1). If the movant establishes "the absence of evidence supporting an essential element of the non-movant's case," the burden shifts to the non-movant to establish a genuine dispute of material fact. *Sossamon*, 560 F.3d at 326 (citing *Condrey*, 429 F.3d at 562).

In ruling on a motion for summary judgment, a court should view the facts and evidence in light most favorable to the non-moving party. *Plumhoff v. Rickard*, 572 U.S. 765, 768 (2014). Nevertheless, the court is not obligated to search the record for the non-moving party's evidence. *Keen v. Miller Env't Grp., Inc.*, 702 F.3d 239, 249 (5th Cir. 2012). "Summary judgment may not be thwarted by conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence." *Hemphill v. State Farm Mut. Auto. Ins. Co.*, 805 F.3d 535, 538 (5th Cir. 2015). The Court need only consider the cited materials, but it may consider other materials in the record. FED. R. CIV. P. 56(c)(3). The Court should not weigh the evidence. *Aubrey v. Sch. Bd. of Lafayette Par.*, 92 F.3d 316, 318 (5th Cir. 1996). A credibility determination may not be part of the summary judgment analysis. *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014).

## DISCUSSION

### I.   CONSTRUCTIVE FRAUDULENT TRANSFERS

Tribolet seeks avoidance of payments Compute North made under the Design Build Contract in the total amount of $11,024,097. ECF No. 107 at 8. The payments were:

- March 16, 2022: $8,005,500 for milestone payment #1.

- March 17, 2022: $2,371,500 in released escrowed funds to milestone payment #1.

- August 30, 2022: $647,097.00 for a change order payment.

Tribolet argues that those payments constitute avoidable constructive fraudulent transfers under § 548(a)(1)(B).

To prevail on a constructive fraudulent transfer claim, a plaintiff must establish: (1) a transfer was made of the Debtor's property; (2) the transfer was made within two years of the Petition Date; (3) the Debtor receives less than reasonably equivalent value in exchange for such transfer; and (4) the Debtor was insolvent at the time of such transfer.

11 U.S.C. § 548(a)(1)(B); *In re Advanced Modular Power Sys., Inc.*, 213 B.R. 643, 674 (Bankr. S.D. Tex. 2009).

The sole issue here is whether the Design Build Contract payments were made for less than reasonably equivalent value. The Fifth Circuit has explained that value is reasonably equivalent when it is "substantially comparable to the worth of the transferred property." *In re Louisiana Pellets, Inc.*, 838 F. Appx. 45, 49 (5th Cir. 2020) (quoting *BFP v. Resolution Tr. Corp.*, 511 U.S. 531, 548 (1994)). Value is determined at the date of the transfer. *Id.* Determination of reasonable equivalency is judged from the standpoint of creditors. *Id.* ("The proper focus . . . is on the net effect of the transfers on the debtor's estate, the funds available to the unsecured creditors." (citation and quotation marks omitted)).

Bootstrap and Corpus Christi Energy Park argue that the payments were made in satisfaction of an antecedent/present debt under a valid contract and therefore constitutes an exchange for reasonably equivalent value as a matter of law. Section 548(d)(2)(A) expressly provides that value" includes "satisfaction or securing of a present or antecedent debt." However, reasonably equivalent value is not defined in the Bankruptcy Code.

The Fifth Circuit in *In re Louisiana Pellets*, 838 F. App'x 45 (5th Cir. 2020) provides some guidance. There, the debtor contracted for work related to the construction of a wood pellet manufacturing facility. *Id.* at 47. The debtor made five payments after the contractor submitted invoices for completed work. *Id.* at 51–52. The project ultimately failed because the debtor entered bankruptcy. *Id.* at 47–48. Regardless of the outcome of the project, the Fifth Circuit held that the payments were made for reasonably equivalent value because they reduced the debtor's outstanding debt:

> When a debtor makes a payment on antecedent debt and receives a dollar-for-dollar reduction of that debt . . . the question is easy because the debtor by definition receives reasonably equivalent value—indeed, exactly equivalent

6 / 16

value, assuming, of course that the debt itself was based upon value.

*Id.* at 50. The Fifth Circuit also recognized that reasonably equivalent value was received in another form: expected future benefit regardless whether the benefit is realized. *See id.* at 52 ("These payments ensured that [debtor] did not breach the contract, keeping alive "the expected future benefit[.]'"); *see also In re Treasure Valley Opportunities, Inc.*, 166 B.R. 701, 704 (Bankr. Idaho 1994) (noting that a debtor receives two benefits in making a payment on a **valid contract**: "(1) discharge of the obligation to pay . . . under the contract terms; and (2) property in the form of the continued vitality of the contract." (emphasis added)).

Here, Tribolet does not dispute the validity or the enforceability of the Design Build Contract. But Tribolet argues that the first milestone payment, in the amount of about $10.37 million, was not for reasonably equivalent value. ECF No. 143 at 15. That payment became due upon "Execution and Delivery of the Contract Documents." ECF No. 143-1 at 50. Tribolet argues that the value of contract execution is disproportionate compared to the $10.37 million payment. Corpus Christi Energy Park contends that the payment reflects "significant value" prior to the execution of the Design Build Contract—namely the upfront work to get the Energy Park site "shovel ready." ECF No. 138 at 41. But Corpus Christi Energy Park also concedes that the first milestone payment was made to mitigate risk because Compute North allegedly failed to provide a letter of credit or other security to ensure funding for the project. ECF No. 138 at 18–19.

The *Louisiana Pellets* principles nonetheless apply here. Reasonably equivalent value may be recognized by "less tangible" benefits like "keeping the construction project alive" and "preserving the expected future value" of the contract. *Id.* at 52. It is a fundamental principle of contract law that a promise of performance is, itself, value. *See In re Cent. Ill. Energy Coop.*, 526 B.R. 786 ("Valuable consideration for a contract consists of some right, interest, profit or benefit accruing to one party, or some forbearance, detriment, loss or responsibility

7 / 16

given, suffered or undertaken by the other."). Here, the expected benefit to Compute North would be Corpus Christi Energy Park's performance under the contract and eventual ownership of a crypto-mining data center. Indeed, the record reflects that Compute North understood the expected value of the contract by proceeding to perform under the contract despite Corpus Christi Energy Park's alleged default. Although the Design Build contract ultimately failed, "the later failure or depreciation of an obligation" is not relevant to the "examination of reasonable equivalency." *Id.* at 51.

Tribolet also attempts to create a fact issue as to the project's value by introducing evidence that its lender refused to fund the Project. ECF No. 138-1 at 93–93; 143-3 at 62. That argument is unavailing. A lender's subsequent refusal to provide funding bears little as to whether the Design Build Contract lacked value when the first milestone payment was made.

The payment of about $647,097 in connection with the change order was also made in exchange for reasonably equivalent value as a matter of law. The change order was executed by the parties for the procurement of voltage breakers. ECF No. 138-2 at 57–60. Corpus Christi Energy Park incurred a charge from its subcontractor as the result of the change order. ECF No. 138-2 at 59. Tribolet offers no response regarding the change order payment to suggest it was made without reasonably equivalent value.

Tribolet's constructive fraudulent transfer claim fails as a matter of law.

## II.   UNJUST ENRICHMENT

Corpus Christi Energy Park argues that Tribolet's unjust enrichment claim fails as a matter of law because a valid, express contract governs this dispute.

"In Texas, unjust enrichment is based on quasi-contract and is unavailable when a valid, express contract governing the subject matter

of the dispute exists." *Coghlan v. Wellcraft Marine Corp.*, 240 F.3d 449, 454 (5th Cir. 2001). The unjust enrichment doctrine applies "to disputes which for one reason or another are not governed by a contract between the contending parties." *Burlington Northern R. Co. v. Southwestern Elec. Power Co.*, 925 S.W.2d 92 (Tex. App.—Texarkana 1996).

The Court previously denied dismissal of the unjust enrichment claim at the Rule 12(b)(6) stage, recognizing that equitable recovery may be permitted in certain circumstances in Texas. ECF No. 127 at 7. At the summary judgment stage, the record demonstrates that the parties' dispute is governed by the Design Build Contract. Tribolet seeks recovery of the same payments made under the Design Build Contract through both breach of contract and unjust enrichment theories. ECF No. 107 at 14, 20.

The Design Build Contract expressly governs remedies for Compute North's alleged injuries. The Contract provides that if Corpus Christi Energy Park fails to furnish an AEP Letter of Agreement within the specified timeframe, Corpus Christi Energy Park "shall promptly refund to [Compute North] all amounts paid to [Corpus Christi Energy Park] under this Agreement and the Term Sheet . . . ." ECF No. 143-1 at 10. Article 11.2 also provides Compute North a remedy to terminate the Design Build Contract for cause. ECF No. 143-1 at 37.

Tribolet nevertheless argues that the Design Build Contract does not address the subject matter of this dispute:

> In any event, the provision of the Design Build Contract does not contemplate this specific circumstance, the Debtors paid Defendants over $11 million on the contract, the contract was terminated before completion, and Debtors received nothing in return.

ECF No. 143 at 23. Just because the contract was terminated and Compute North "received nothing in return" does not mean that the contract lacks subject matter over the dispute.

Tribolet further argues that a party may recover for unjust enrichment when a contract is not fully performed, citing *City of Harker Heights v. Sun Meadows Land, Ltd.*, 830 S.W.2d 313 (Tex. App.—Austin 1992) and *Pasadena Assoc. v. Connor*, 460 S.W.2d 473 (Tex. App.—Houston 1970).

*Harker Heights* concerned an oral agreement lacking specific contractual terms. 830 S.W.2d at 319 ("The finding of an unspecified agreement between the City and the developers, that the City breached in ways that are never defined, does not preclude a judgement for the developers based on the jury's verdict that the City was unjustly enriched."). *Pasadena Associates* involved a financing contract that failed to materialize at the outset because a condition precedent never occurred. 480 S.W.2d at 475. There was no breach of a contract. But because the plaintiffs advanced consideration to the defendant in preparation of the financing agreement, they were entitled to receive the transferred value as restoration. *See id.* at 480.

The situation here is starkly different from the cases above. The Design Build Contract was heavily negotiated with specified terms. The parties do not dispute the validity and enforceability of the contract. The Design Build Contract governs the subject matter of the parties' dispute.

The unjust enrichment claim fails as a matter of law.

## III.   ALTER EGO/PIERCE THE CORPORATE VEIL

Tribolet seeks to hold Bootstrap liable for Corpus Christi Energy Park's obligations under the Design Build Contract. To do so, Tribolet must pierce the corporate veil under Texas law. Corpus Christi Energy Park and Bootstrap argue that Tribolet cannot pierce the corporate veil because Tribolet cannot prove actual fraud as a matter of law.

TEX. BUS. ORGS. CODE §§ 21.223, .224, provides the exclusive basis for imposing contractual liability on a member of a limited liability company. To pierce the veil in a breach of contract case, a plaintiff must

demonstrate that the member used the entity for "the purpose of perpetrating and did perpetuate an actual fraud on the [plaintiff] primarily for the direct personal benefit" of the member. § 22.223(b).

Evidence that a company was used as an alter ego, standing alone, does not create an issue of material fact that it was used to commit actual fraud on the plaintiff. *See Metroplex Mailing Servs., LLC v. RR Donnelley & Sons Co.*, 410 S.W.3d 889, 896–97 (Tex. App.—Dallas 2013). Tribolet must also show that the corporate fiction was used for an illegitimate purpose: perpetuating actual fraud on Compute North for Bootstrap's direct personal benefit. *See U.S. KingKing, LLC v. Precision Energy Servs., Inc.*, 555 S.W.3d 200, 217 (Tex. App.—Houston 2018). Actual fraud is defined as "involv[ing] dishonesty of purpose or intent to deceive." *Spring St. Partners-IV, L.P. v. Lam*, 730 F.3d 427, 442 (5th Cir. 2013) (citation omitted). "Courts may deduce fraudulent intent from all of the facts and circumstances." *Id.*

Here, Compute North provides ample evidence to support the theory that Corpus Christi Energy Park is an alter ego of Bootstrap.

- Bootstrap owns 100% of Corpus Christi Energy Park, both share common management
- Bootstrap and Corpus Christi Energy Park commingled property
- Corpus Christi Energy Park never maintained its own accounting records
- Payments under the Design Build Contract were made to Bootstrap
- Corpus Christi Energy Park had no employees
- Corpus Christi Energy Park was undercapitalized

But as stated by *Metroplex*, evidence of alter ego by itself is not enough to pierce the veil. Tribolet must also prove that it was used for an illegitimate purpose. Tribolet's main assertion for actual fraud is that the "entire structure of and relationship between Bootstrap, Corpus Christi Energy Park, and the McKinzie entities was calculated to

11 / 16

provide maximum benefit to Bootstrap while placing maximum risk on Compute North." ECF No. 143 at 35. That is not sufficient reason to disregard the corporate form. *See Willis v. Donnelly*, 199 S.W.3d 262, 271 (Tex. 2006) ("A bedrock principle of corporate law is that an individual can incorporate a business and thereby normally shield himself from personally liability for the corporation's contractual obligations.").

The Fifth Circuit has limited contract veil-piercing to situations where a claimant is "unable to foresee and contractually avert potential risks." *Belliveau v. Barco, Inc.*, 987 F.3d 122, 130 (5th Cir. 2021). The Fifth Circuit relied on the reasoning set forth in *Shook v. Walden*:

> The basic notion was that contract claimants, unlike most third parties suing in tort, had voluntarily chosen to deal with the corporation and absent some deception or fraud, would have had the opportunity to apportion, through negotiated contract terms, the risk that the entity would be unable to meet its obligations.

368 S.W.2d 604, 620 (Tex. App.—Austin 2012) (citing *Lucas v. Texas Indus., Inc.*, 696 S.W.2d 372, 375 (Tex. 1984)) (quotation marks omitted).

This limitation is reinforced by the Texas Supreme Court's ruling in *Southern Union Co. v. City of Edinburg*. There, the Texas Supreme Court found no evidence of "dishonesty of purpose" because the plaintiff was fully aware about the affiliate arrangement. 129 S.W.3d 74, 88 (Tex. 2003).

In *Belliveau*, the plaintiff granted a company exclusive license to his intellectual property in exchange for annual royalty interests. 987 F.3d at 126. The company was purchased the following year by Barco for $55 million. *Id.* at 127. The company did not prosper and Barco sold it to a third party for $7.5 million. *Id.* at 127. During the negotiations for the sale, Barco entered into an agreement with the company to grant Barco a license over the plaintiff's IP, which plaintiff valued at over $100 million, for only $75,000. *Id.* at 130. The plaintiff alleged that the company breached its contract because the subsequent license was not

commercially reasonable.  *Id.* at 128.  Instead of suing the company, the plaintiff sued Barco.  *Id.*  The Fifth Circuit affirmed the trial court's summary judgment ruling that the corporate form was not used to perpetuate actual fraud, because a mere breach of contract claim was not enough.  *See id.* at 131 ("The High End License could have provided a number of alternative contractual measures to protect Belliveau's interest and ward off claims he is now asserting.").

Here, Compute North voluntarily entered into the Term Sheet Agreement and Design Build Contract with Corpus Christi Energy Park after months-long negotiations with sophisticated counsel.  Compute North was well aware of Bootstrap's involvement of the Corpus Christi Energy Park project.  Like in *Belliveau*, Compute North could have negotiated contractual provisions to protect itself against the alleged wrongdoings that it asserts now—Bootstrap using Compute North's money from the terminated Design Build Contract to fund related projects in the Energy Park.  Like in *Belliveau,* there is nothing on the record to suggest that Compute North was "kept in the dark" during negotiations preceding the execution of the Design Build Contract.  The circumstances here are insufficient to support a veil piercing claim.

The alter ego/veil piercing claim, to hold Bootstrap liable for Corpus Christi Energy Park's contractual obligations, fails as a matter of law.

To be clear, this opinion does not foreclose equitable remedies such as a constructive trust. The Court is concerned with allegations regarding Bootstrap's alleged outright diversion of contract payments. Tribolet provides evidence that Bootstrap used Compute North's payments to complete the 1102 McKinzie and diverted funds for the 1242 McKinzie project.  ECF Nos. 143-2 at 67–68, 76–76, 82; 143-3 at 21.  Bootstrap also used Compute North's termination option fee payment in the amount of $758,880.00 to purchase the 114-acre land for the Energy Park.  ECF No. 143-3 at 7.

A constructive trust or other equitable remedies may be available with respect to funds allegedly retained or diverted by Bootstrap. "Constructive trusts . . . have the very broad function of redressing wrong or unjust enrichment with keeping the basic principles of equity and justice." *Meadows v. Bierschwale*, 516 S.W.2d 125, 131 (Tex. 1974). Where one party "holds funds which in equity and good conscience should be possessed by another" a constructive trust may be imposed. *Id.* "[T]here is no unyielding formula to which a court of equity is bound is bound in decreeing a constructive trust, since the equity of the transaction will shape the measure of relief granted." *Id.*

The parties did not raise arguments regarding a constructive trust at this summary judgment stage. The Court also expresses no opinion on whether a constructive trust should be imposed. Tribolet ultimately bears the heavy burden of proving entitlement to imposition of a constructive trust at trial. *See Brooks v. Wycough*, No. 12-25-00138-CV, 2026 WL 1096917 (Tex. App.—Tyler Apr. 22, 2026) ("The law is suspicious of resulting or constructive trusts, and consequently, a heavy burden of proof is placed on the party attempting to establish the existence of one.").

## IV.   PREFERENTIAL TRANSFER

Tribolet concedes he is not seeking to avoid storage fee payments in the amount of $35,000 as preference transfers. ECF No. 143 at 36. Corpus Christi Energy Park does not seek summary judgment on the $647,096.00 change order payment. Tribolet's preference transfer claim over the remaining $647,096.00 survives summary judgment.

## V.   VIOLATION OF AUTOMATIC STAY

Tribolet argues that Compute North had a legal and equitable interest in the 1102 McKinzie and 1242 McKinzie projects as of the Petition Date. The basis of those alleged interests is that Corpus Christi Energy Park and Bootstrap retained payments made under the Contract and used those payments for projects. Tribolet asserts that they violated the automatic stay by marketing and selling those projects.

14 / 16

Tribolet seeks damages for the violation of the automatic stay under § 105.

A bankruptcy court can award damages to a corporate debtor for certain violations of the automatic stay under § 105. *In re San Angelo Pro Hockey Club, Inc.*, 292 B.R. 118, 124 (Bankr. N.D. Tex. 2003); *In re Nicole Gas Prod., Ltd*, 916 F.3d 566, 579 (6th Cir. 1989) (violating the automatic stay constitutes civil contempt). The standard for holding a party in contempt was modified by the Supreme Court in *Taggart v. Lorenzen*, 587 U.S. 554 (U.S. 2019). Under the *Taggart* mandate, a party may be held in civil contempt if: "(1) the party violated a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts; (2) the party did so with knowledge of the court's order; and (3) there is no fair ground of doubt as to whether the order barred the party's conduct[.]" *In re City of Detroit*, 614 B.R. 255, 265 (Bankr. E.D. Mich. 2020). With respect to the last prong, contempt is appropriate if there is no objectively reasonable basis for concluding the creditor's conduct might be lawful. *Taggart*, 587 U.S. at 1799.

Here, Tribolet alleges that Corpus Christi Energy Park and Bootstrap violated the stay by controlling prepetition materials, equipment, plans, and other "Work"[2] that allegedly were property of the estate. ECF No. 143 at 37. Tribolet contends that those "Work" items became Compute North's property upon the first milestone payment. Corpus Christi Energy Park and Bootstrap dispute such interpretation. The Contract does not unambiguously establish that Compute North obtained title to the "Work." The ambiguity is further highlighted by the fact that Compute North did not list any interest in "Work" in its schedules. At a minimum, there is a bona-fide dispute concerning the ownership rights of the alleged estate property.

---

[2] The Design Build Contract provides: *Work* is comprised of all Design-Builder's design, construction and other services required by the Contract Documents, including procuring and furnishing all materials, equipment, services and labor reasonable inferable from the Contract Documents.

15 / 16

Both parties have been engaged in a bona-fide dispute over rights and obligations under the Design Build Contract. The existence of such complex dispute shows that there is at least some "fair ground of doubt" regarding Corpus Christi Energy Park or Bootstrap's conduct in relation to the alleged stay violation. To be clear, the Court is not concluding as a matter of law that there was no violation of the stay. Some of Corpus Christi Energy Park or Bootstrap's conduct may or may not have violated the stay. But *Taggart* requires substantially more showing to entitle a party to contempt damages. At the summary judgment stage, Tribolet has not raised a genuine issue of fact as to whether damages are warranted for a stay violation.

Count Two fails as a matter of law.

## CONCLUSION

A separate order will be entered.

SIGNED 05/27/2026

_____
Marvin Isgur
United States Bankruptcy Judge

16 / 16